# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES *ex rel.* SCOTT STAMBUSH, ) | Case No. 1:16-cv-01728(APM) |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| CAREER STAFF UNLIMITED, INC. d/b/a THERAPISTS UNLIMITED, UNIVERSAL PHYSICAL THERAPY, INC. d/b/a THERAPISTS UNLIMITED, MEDICAL STAFF NETWORK, INC., ALL SOURCE RECRUITING GROUP d/b/a ARDOR HEALTH SOLUTIONS, and MANAGEMENT HEALTH SYSTEMS, INC. d/b/a MEDPRO STAFFING & DIRECT PLACEMENT, HCA HOLDINGS, INC., HEALTHTRUST WORKFORCE SOLUTIONS, LLC, f/n/a PARALLON WORKFORCE SOLUTIONS, LLC, MEMORIAL HERMANN HEALTH SYSTEM, MEMORIAL HERMANN ACOUNTABLE CARE ORGANIZATION, JACKSON THERAPY PARTNERS HOLDINGS, INC. and JACKSON THERAPY PARTNERS, LLC ) | DEMAND FOR JURY TRIAL |
| ) | |
| ) | FILED UNDER SEAL PURSUANT TO 31 U.S.C. 3730 |
| Defendants. ) | |

## RELATOR, SCOTT STAMBUSH'S SECOND AMENDED COMPLAINT PURSUANT TO 31 U.S.C. §§ 3729-3732 OF THE FEDERAL FALSE CLAIMS ACT

The United States of America, by and through his counsel, *qui tam* relator Scott Stambush ("Relator" or "Mr. Stambush"), brings this action under 31 U.S.C. §3729, *et seq.,* as amended (False Claims Act) to recover all damages, penalties and other remedies established by the False Claims Act ("FCA") on behalf of the United States for violations by the Defendants

U.S. ex rel. Stambush SAC

1

(*see*, Part II) for exploiting the Department of Veterans Affairs ("Veterans Affairs" or "VA")[1] and the Department of Health and Human Services -Centers for Medicare and Medicaid ("CMS").[2] Defendants submitted legally false bids, claims, attestations and certifications to the VA and to CMS.

The FSS 621 I solicitation process at the VA begins with a bid, which the prospective contractor submits to the government. If the contractor is chosen, then subsequent claims for payment for services provided are submitted to the government.

In order to be eligible to submit claims to CMS, providers must first sign CMS Form 460. (Ex A). If the entity is an Accountable Care Organization ("ACO"), then the Medicare Shared Savings Participating ACO ("MSSP ACO") is required to certify that the conditions in the Medicare Shared Savings Program Accountable Care Organization Participation Agreement ("ACO Participation Agreement") are met. (Ex. B). All physician providers are required to certify that certain conditions precedent, including that the information is "true, accurate and complete" are met for payment when submitting the CMS Form 1500. (Ex. C).

---

[1] U.S. Department of Veterans Affairs, *History*, https://www.va.gov/about_va/vahistory.asp (last visited June 16, 2018) (detailing the evolution of the Department of Veterans Affairs, as well as describing the administrations that comprise the VA – the Veterans Health Administration, the Veterans Benefits Administration and the Veterans Cemetery Administration. The Veterans Health Administration is the largest of the three administrations). The VA's Office of Administration "provides a variety of necessary administrative services to Department of Veterans Affairs (VA) headquarters organizations and employees located in Washington DC and at satellite locations.").

[2] Centers for Medicare and Medicaid Services, *Research, Statistics, Data & Systems*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Research-Statistics-Data-and-Systems.html (last visited June 16, 2018).

U.S. ex rel. Stambush SAC

Hospitals are required to file an annual Hospital Form 2552-10 – the Medicare Cost Report. (Ex. D). "The cost report contains provider information such as facility characteristics, utilization data, cost and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data."[3] Form S-3 requires wage and expense reporting for healthcare service providers.

The Defendants knowingly defrauded the United States Government and knowingly retained the overpayments. These material false certifications, attestations and submissions violate 31 U.S.C. §§ 3729, *et seq.,* which has caused the government and the tax payers financial harm.

## I. PRELIMINARY STATEMENT

1.      This is an action to recover damages and civil penalties on behalf of the United States of America, for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, arising from false or fraudulent records, statements, bids or claims, or any combination thereof, made, used or caused to be made, used, or presented, or any combination thereof, by the Defendants, together with their current and former shareholders; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them, their agents, employees, or co-conspirators, or any combination thereof, with respect to false claims arising from the Defendants' knowing submission of material false certifications, attestations and claims, as well

---

[3] Centers for Medicare & Medicaid Services, *Cost Reports*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Downloadable-Public-Use-Files/Cost-Reports/ (last visited June 17, 2018).

U.S. ex rel. Stambush SAC

as knowing retention of overpayments, violates 31 U.S.C. §§ 3729, *et seq.,* which has caused the government and the tax payers financial harm.

     2.    Originally enacted in 1863 during the Civil War, the False Claims Act was substantially amended by the False Claims Amendments Act of 1986, signed into law on October 17, 1986; and by the Fraud Enforcement and Recovery Act of 2009, signed into law on May 20, 2009. Congress' intent was to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees and others who act in furtherance of the purposes of the Act. Congress acted after finding that fraud in federal programs and procurement is pervasive and that the Act, which Congress characterized as the primary tool for combating fraud in government contracting, was in need of modernization.

     3.    This action involves Defendants' activities of antitrust collusion, price-fixing (pricing manipulation) and non-poaching agreements (Sherman Act, 15 U.S.C. § 1) in both the procurement of government contracts for healthcare staffing services with the Veterans Administration contrary to Federal Acquisition Regulations ("FAR"), CFR Title 48 (2013) and 48 CFR §3.303, as well as the submission of claims by Medicare Shared Savings Program Accountable Care Organizations ("ACOs") for payment contrary to 42 C.F.R. § 425.208, and the submission of Medicare Cost Reports by providers contrary to 42 CFR § 413.24 and Section 1886(d)(3)(E) of the Social Security Act. Defendants knowingly violated antitrust laws and falsely certified that they had not violated CFR Title 48 (2013), 48 CFR §3.303, 42 CFR § 425.208, Section 1886(d)(3)(E) of the Social Security Act, and/or 42 CFR § 413.24 in receiving payments from the United States Government. In turn, they knowingly retained the

overpayments. These material false certifications, attestations and submissions violate 31 U.S.C. §§ 3729, *et seq.,* which has caused the government and the tax payers financial harm.

4.      Based on these provisions, Relator, Scott Stambush, seeks to recover damages and civil penalties arising from Defendants' violations of antitrust laws and the False Claims Act.

## II. PARTIES

5.      Relator Scott Stambush ("Mr. Stambush" or "Relator"), is an individual and citizen of the United States of America residing in Houston, Texas.  Mr. Stambush has direct, first-hand and independent knowledge of the antitrust violations, false statements, bids, attestations, certifications, and claims presented by the Defendants to the United States Government as detailed herein and acquired the information through his role as the Chief Executive Officer of Stambush Staffing, LLC. ("Stambush Staffing").  Stambush Staffing is a competitor company to the Defendants.[4]

6.      Defendant Career Staff Unlimited, Inc. ("Career Staff") is a Delaware corporation and is a subsidiary of Sun Healthcare Group, Inc. (NASDAQ GS: SUNH), which was acquired by Genesis Healthcare in 2012.  Relator alleges that from at least as early as April 1, 2011, Career Staff knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

---

1.      ·BAZ, Enterprises, Ltd., the precursor to Stambush Staffing, was formed on April 10, 1996.  During his over twenty-year history in the healthcare professional staffing industry, Stambush acquired intimate knowledge of the industry and its competitors.

7.      Defendant Cross Country Healthcare, Inc. ("Cross Country"), a national provider of healthcare staffing, is a Delaware corporation (NASDAQ: CCRN), with headquarters in Boca Raton, Florida.  As a national provider it has, from time to time, acquired other staffing entities, e.g., Medical Staffing Network, Inc. in 2014 and Advantage RN, LLC and its subsidiaries (collectively, "Advantage"), on July 1, 2017. Relator alleges that from at least as early as April 1, 2014, Cross Country knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

8.      Defendant Management Health Systems, Inc. d/b/a Medpro Staffing and Direct Placement ("MHS") is a Delaware corporation with payments being sent to and received from Georgia. Relator alleges that from at least as early as November 1, 2016 through the present, MHS knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

9.      Defendant All Source Recruiting Group d/b/a Ardor Health Solutions ("All Source") is a Florida corporation. Relator alleges that from at least as early as March 1, 2015 through the present, All Source knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

10.     Defendant AMN Healthcare Services, Inc. (NYSE: AHS) ("AMN"), founded in 1985, is headquartered in California. Both AMN Healthcare Allied, Inc. and Platinum Select, L.P. are subsidiaries of AMN. Relator alleges that from at least as early as January 2008 through the present, AMN knowingly submitted or caused to be submitted false statements, bids,

certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

11.     Defendant Maxim Healthcare Services ("Maxim") is headquartered in Maryland. Relator alleges that from at least as early as July 1, 2013 through the present, Maxim knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

12.     Defendant SHC Services, Inc. d/b/a Supplemental Healthcare ("SHC") is headquartered in Utah. Relator alleges that from at least as early as June 2013, SHC knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

13.     HealthTrust Workforce Solutions, LLC ("HealthTrust"), f/n/a Parallon Workforce Management Solutions, LLC ("Parallon"), a subsidiary of HCA Holdings, Inc. ("HCA"), is headquartered in Nashville, Tennessee and conducts business in Texas and throughout the United States. According to HCA's U.S. Securities and Exchange Commission 2011 Form S-1, "[w]e HCA are the largest non-governmental hospital operator in the U.S. and a leading comprehensive, integrated provider of health care and related services ... with approximately 41,800 beds." According to HCA's *Investor Update 1Q 2017*, HCA's market share ranks first or second in 27 out of 38 markets. Relator alleges that from at least as early as June 2006, HCA knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

14.     Memorial Hermann Hospital System ("Memorial Hermann") is headquartered in Houston, Texas. Premier Staffing is a department within Memorial Hermann.[5] According to *The Houston Business Journal*, Memorial Hermann is tied with HCA's Gulf Coast Division as the largest health system in the Houston area with 15 hospitals. Collectively, HCA Gulf Coast Division and Memorial Hermann own 30 of the 68 hospitals in the Houston Metro Area.[6] Relator alleges that on or about January 2006, Memorial Hermann knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

15.     Memorial Hermann Accountable Care Organization ("Memorial Hermann ACO") is a Medicare Shared Savings Program ACO that is headquartered in Houston, Texas.  Relator alleges that from July 2012, Memorial Hermann ACO knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

16.     Jackson Therapy Partners Holdings, LLC ("Jackson") is incorporated in Georgia. Relator alleges that from January 2012, Jackson knowingly submitted or caused to be submitted false statements, bids, certifications, attestations and claims to the United States Government in violation of, *inter alia*, the Sherman Act and the False Claims Act.

### III. JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over these claims brought under the False Claims Act, 31 U.S.C. §§ 3279, *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732.  This Court has

---

[5] Memorial Hermann Premier Staffing, *Memorial Hermann's Premier Staffing*, http://www.memorialhermann.org/mh_templates/Detail.aspx?id=2872 (last visited June 15, 2018).
[6] Houston Business Journal, *Largest Houston-Area Health Care Systems* (Nov. 29, 2017), https://www.bizjournals.com/houston (last visited June 15, 2018).

supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C. §§ 1345 and 1367(a).

18.   This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section of the False Claims Act authorizes nationwide service of process, the Defendants engage in interstate commerce with the VA and CMS, and transact business in this district.  All Defendants have at least minimum contacts with the United States, and can be found in, reside, or transact or have transacted business, in the District of Columbia.

19.   Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendants transact business in the District of Columbia and the VA – Office of Acquisition and Logistics (in charge of procurement for all goods and services for the VA) is located at 801 Vermont Avenue, NW, Washington, DC 20420 and the HHS headquarters is located at 200 Independence Ave, SW, Washington, DC 20201.[7]

20.   There have been no public disclosures of the allegations and transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e).

21.   After filing the initial Complaint on August 25, 2016, the October 3, 2017 First Amended Complaint and this Second Amended Complaint under seal, copies of the Complaint, First Amended Complaint and this Second Amended Complaint were served upon the United States and the United States Attorney's Office for the District of Columbia, together with a written disclosure statement setting forth all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2). *See* FED. R. CIV. P. 4.

---

[7] U.S. Department of Veterans Affairs, *Contacts and Locations, Office of Acquisition and Logistics*, http://www.va.gov/oal/about/index.asp (last visited Oct. 1, 2017).

U.S. ex rel. Stambush SAC

22.     Mr. Stambush is the original source because he possesses direct and independent knowledge of the non-public information upon which the allegations herein are based. *See* 31 U.S.C. § 3730(e)(4)(B).   Mr. Stambush, in his role as Chief Executive Officer of Stambush Staffing, acquired non-public information from approximately April 1996 through the present. Defendants allegedly engaged in antitrust collusion, price-fixing and non-poaching agreements (Sherman Act, 15 U.S.C. § 1) in both the procurement of government contracts for healthcare staffing services with the Veterans Administration contrary to Federal Acquisition Regulations ("FAR"), CFR Title 48 (2013) and 48 CFR §3.303, as well as the submission of claims by Medicare Shared Savings Program Accountable Care Organizations for payment contrary to 42 C.F.R. § 425.208, and the submission of Medicare Cost Reports by providers contrary to 42 C.F.R. § 413.24 and Section 1886(d)(3)(E) of the Social Security Act. *See* FED. R. CIV. P. 9(b); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009); and *Bell Atlantic Corp. v. Twombly*, 425 F.3d 99 (2007).

23.     "Pursuant to *Twombly* and *Iqbal*, a complaint will survive a motion to dismiss only if it contains factual allegations in addition to legal conclusions. Factual allegations that are simply labels and conclusions, and a formulaic recitation of the elements of a cause of action are not sufficient. . . . [C]ourts need not accept the legal conclusions drawn from the facts alleged in a complaint, and they need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Cook v. Howard*, 2012 WL 3634451 (4th Cir. Aug. 24, 2012) (citations and internal quotation marks omitted).

24.     "An 'original source' is an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action … which is based on the information." 31

U.S.C. § 3730(e)(4)(B). The D.C. Circuit has explained that this provision requires "direct and independent knowledge of *any* essential element of the underlying fraud transaction." *United States ex rel. Anthony Oliver v. Philip Morris USA, Inc.*, 101 F.Supp.3d 111, 128 (D. D. C. 2015) (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 657 (D.C. Cir. 1994)). Mr. Stambush's first-hand knowledge is derived from the contractual and written correspondence that he obtained directly from Memorial Hermann and HealthTrust f/n/a Parallon, as well from former employees, and through his veteran-owned business, Stambush Staffing.

25.     Based on his twenty plus years of industry knowledge about staffing pricing, Mr. Stambush deduced from the Federal Supply Schedule ("FSS") 621 I[8] that the bids and claims being submitted by the Defendants were in violation of antitrust laws and the False Claims Act.

26.     Between 2005 and the present, the Defendants allegedly submitted or caused to be submitted false bids, claims, certifications and attestations at all relevant times to provide healthcare staffing services on a nationwide basis to the VA and its nearly 1,200 medical facilities.

27.     Between 2005 and the present, Relator had direct industry knowledge that Defendant Memorial Hermann Hospital System and Defendant HCA's hospitals were required to submit annual Medicare Cost Reports, which require reporting wages and expenses.

---

[8] U.S. Department of Veterans Affairs, *Office of Acquisition and Logistics – Federal Supply Schedule Service*, https://www.va.gov/oal/about/nacFsss.asp (last visited June 16, 2018) (relaying the FSS mission for the VA and defining the Schedule programs, which amount to nearly 1,900 contracts and nearly $11 billion in annual sales and includes the 621 I program).

28.     Mr. Stambush possesses email correspondence, which lists the numerous healthcare staffing agencies and the actual rates that the Defendants HealthTrust and Memorial Hermann paid; thereby making the rates known to the industry participants.

29.     Mr. Stambush has direct knowledge that the HealthTrust and Memorial Hermann agreements, which were imposed upon the staffing agencies (e.g., Career Staff), currently have or have had "take it or leave it" fixed pricing, a no-poaching provision, and collusion among competitors for the designation of travel and per diem healthcare staffer compensation.

30.     From 2012 to the present, Relator knew that ACOs existed in the healthcare market place.

31.     Mr. Stambush acquired first-hand knowledge that the Defendants' actions led to the submission of claims by Medicare Shared Savings Program Accountable Care Organizations for payment contrary to 42 C.F.R. § 425.208, and the submission of Medicare Cost Reports (specifically, the S-3 Worksheet) by providers[9] contrary to 42 CFR § 413.24 and Section 1886(d)(3)(E) of the Social Security Act.

32.     Mr. Stambush has complied with all other conditions precedent to bringing this action.

### IV. FACTUAL ALLEGATIONS

33.     Over the past several years, Stambush noticed the following: (1) certain hospital providers (e.g., Memorial Hermann and HCA's hospitals) and staffing agencies (e.g., Parallon) were shifting away from asking for bids to dictating the price that they would pay for certain healthcare staffing services; (2) non-solicitation provisions were incorporated into contracts; (3) Memorial Hermann's ACO was formed and was required to submit the Medicare

---

[9] The term "provider agreement" is defined in 42 CFR 489.3 as an agreement between CMS and one of these providers specified in this section to provide services and to comply with the requirements of section 1866 of the Act.

Shared Savings Program Accountable Care Organization Participant Agreement, which expressly requires, pursuant to 42 CFR § 425.208(b), compliance with laws and FAR 49.401; (4) violations of FAR 8.4 for the false submission of bids to the VA through the FSS 621 I process; and (5) collusion on the designation of travel and per diem health care staffers, which led to the Defendant Staffing Agencies disguising the per diem and travel clinical staff as employees, whose hourly rate was far below fair market value. Non-labor costs, such as stipends for housing and food, were also manipulated. These actions formed the basis of providers' false statements on Medicare Cost Reports, Worksheet S-3.

### The Underlying Antitrust Allegations

34.      HealthTrust Workforce Solutions, LLC f/n/a Parallon Workforce Management Solutions, LLC (subsidiaries of HCA Holdings, Inc.) and Memorial Hermann's human resources department premiere staffing (internal department within Memorial Hermann) are the "Firms" discussed herein.

35.      The Firms contract with the Customers – the government and private payors - through their parent organizations HCA Holdings, Inc. ("HCA"), Memorial Hermann Hospital System, and Memorial Hermann Accountable Care Organization ("Memorial Hermann ACO").[10] The Firms also contract with the Sellers – Staffing Agencies. The Customers also contract with the Sellers, which include the Defendant Staffing Agencies (e.g.., Genesis, Career Staff Unlimited).

---

[10] There are a significant number of Medicare beneficiaries served by Memorial Hermann's ACO. "in calendar year 2013, Memorial Hermann ACO served 34,430 Medicare beneficiaries and earned shared-savings payments totaling $28.3 million." Centers for Medicare & Medicaid, *Medicare Shared Savings Program Performance Year 1 Results* (Sept. 2014), https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/sharedsavingsprogram/Downloads/MSSP-PY1-Final-Performance-ACO.pdf.

U.S. ex rel. Stambush SAC

36.     Together, the Firms and Sellers colluded to price-fix, created an anti-competitive landscape through, for example, non-poaching agreements, and in turn, caused false claims to be submitted to the United States Government through Medicare Cost Reports,[11] claims for payment by Accountable Care Organizations ("ACOs"), and the Veterans Administration's procurement process.

37.     In a March 27, 2007 communication between Mr. Stambush and Memorial Hermann, Mr. Stambush stated: "I believe you when you say Stambush is the only agency that has requested a rate increase, but, I have lost several candidates to at least one other Houston-based agency that offered them traveling rates to stay in Houston. … In other words, some agencies may not request a rate increase but they are getting one anyway by lying about who is a traveler. Sorry to burden you with this, but I thought a little background would be helpful. Finally, STAMBUSH has NEVER charged anyone for a traveler in this town."

---

[11] Chad Tysdahl, *BKD Industry Insights – Changes to Cost Report Worksheets Affecting Wage Index* (Mar. 2017), http://www.bkd.com/articles/2017/changes-to-cost-report-worksheets-affecting-wage-index.htm. "The Medicare Provider Manual underwent changes, which became effective for the reporting periods after September 30, 2016. These changes are found in Publication 15-2, Chapter 40. Although wage index reporting was previously required, Publication 15-2, Chapter 40 identified new requirements on Worksheet S-3. CMS has added Lines 14.01 and 14.02 to enhance the wage index data collection related to home offices and related organizations. All home office and other related organization salaries, hours and wage-related costs were previously included on Line 14. Line 14.01 now only will include the home office salary and hour data, while Line 14.02 only will include other related organization salary and hour data. CMS has added Lines 25.50, 25.51, 25.52 and 25.53 to separately report the wage-related costs related to home offices and related organizations. Home office and related organization wage-related costs were previously lumped together with salaries on Line 14. This transmittal now requires the home office wage-related costs to be included on Line 25.50. Related organization wage-related costs will now be included on Line 25.51. In addition, Line 25.52 has been added to include the wage-related costs in regard to any home office Part A physician administrative salaries reported on Line 15. Regarding Lines 25.50 through 25.53, Worksheet S-3, Part IV instructions state, "if a wage-related cost associated with the home office is not 'core' and is not a category included in 'other' wage-related costs on Line 18, the cost must not be included on Line 14, or subscripts." This is a clarification that home office wage-related costs follow the same guidance as hospital wage-related costs."

38.     In a March 25, 2009 communication, Mr. Robert Blake (Memorial Hermann) relayed to Mr. Stambush that "[a]s for the rates, your competitors may be charging other clients higher rates, but here, the rates are the same from one vendor to another." Beginning around 2005, the contracting process between the Firms and the Staffing Agencies migrated from a collaborative process of negotiating rates to a "take it or leave it" stance on set pricing.

39.     A November 11, 2011 communication originating from Patricia Beale, RN, BSN, Human Resources Director, Parallon Workforce Solutions – Gulf Coast Division (patricia.beale@parallon.net) was sent to all of the contracting Staffing Agencies with individual names and email addresses exposed. This email stands for the proposition that set rates were being imposed upon the contracting Staffing Agencies by the Firms.

40.     An example of a no-poaching provision is a January 2012 Jackson Therapy Partners' STAFFING EMPLOYMENT UNDERSTANDINGS contract expressly stating in paragraph 13 that "[e]mployee shall not, for a period of 90 days following the expiration or earlier termination of an assignment, work at or perform any services as a therapist for the Facility or any other facility affiliated with the Facility, including through a placement by another placement or employment agency."

41.     A May 11, 2012 email communication originating from Connie Cowan, Regional Vice President of Operations – Gulf Coast Division, (connie.cowan@parallon.net) was sent to all of the contracting Staffing Agencies with individual names and email addresses exposed. This email, captioned "Hiring HCA Employees" expressly stated that it was a contractual violation to have a "Former Employee" or "Current Employee" work for an HCA facility through a Staffing Agency. "Former Employees shall be deemed to include any individual who was employed by

Company [HCA] or any of the Facilities within twelve (12) months prior to assignment by Agency as Professional Staff for Company."

42.     On October 30, 2012, the Director of Client Relations for Medefis, Inc., which is owned by AMN Healthcare Services, Inc., communicated with Mr. Stambush regarding contracting with Medefis for healthcare staffing services. The USER AGREEMENT, paragraph 6, highlights the anti-competitive behavior amongst the healthcare staffing industry. "You represent                                                                                          and warrant that during the term that You use the Site, and for a period of 12 months following termination of this Agreement, You will not, directly or indirectly, contact any Hospital

or any other User that submits a Posting or otherwise uses this Site, in order to fill any open employment     positions with said Hospital or     User in an effort to circumvent the placement process established by the Site. You further agree that during the term that You use the Site, and for a period of 12 months following termination of this Agreement, You will not use any information or content from the Site in order to establish or assist a competitive site."

43.     Effective September 20, 2015, Memorial Hermann dictated in a new, non-negotiable rate schedule to its contracting Staffing Agencies, which explicitly prohibited shift differentials for "[e]vening, night, or weekend differentials" in Exhibit A – Memorial Hermann Rate Schedule Addendum – Travel and Local RN, LVN, ORT Bill Rates. Memorial Hermann used its monopolistic position to engage in exclusionary conduct that harmed the competitive process and could not be justified as creating greater efficiencies (i.e., assessment of or verification of credentials).

44.     In September 2015, HealthTrust f/n/a Parallon agreement expressly states in section 4.7, "[d]uring the Term and for a period of 12 months following the expiration or

termination thereof, Subcontractor and its Affiliates and their respective officers, directors and employees shall not, without the prior written consent of Parallon or Client, as applicable, employ, solicit for employment or engage as an independent contractor, any Current Employee. The parties agree that direct solicitation shall not include general recruitment activities, including without limitation general advertising through internet, mail, telephone campaigns, trade publications and/or professional associations." All staffing agencies contracting with HealthTrust were mandated to sign it.

45.     There are several examples of deceptive wage manipulation and price fixing of travel and per diem clinical staffing rates.

46.     In 2013, Mr. Stambush learned during the regular course of business that a former employee, who was interested in being re-hired by Stambush Staffing, was being compensated with below market hourly rates, which were supplemented by non-taxable expenses. The prospective employee substantiated this information by providing a copy of the Jackson Therapy Partners contract, to Mr. Stambush as was usual and customary in the industry.[12] The Jackson Therapy Partners contract indicated that the Taxed Pay Rate was $13.00, Housing Reimbursement was $24.85, Mileage was $4.15, and M&I was $11.55 for a total of $53.55. The Holiday Pay Rate was $39.78, while the Over Time Pay Rate was $80.33. In essence, the wage

---

[12] Paragraph 1 under the ADDITIONAL TERMS AND CONDITIONS of the Jackson Therapy Partners contract states that "Employee shall provide to JTP within five (5) days after execution of this Agreement all of Employee's prior employment and clinical documents and records reasonably requested, including all that are required of JTP or the Facility under Joint Commission (JCAHO) requirements." The Joint Commission "has been approved by CMS as having standards and a survey process that meets or exceeds Medicare's requirements. Health care organizations that achieve accreditation through a Joint Commission "deemed status" survey are determined to meet or exceed Medicare and Medicaid requirements." The Joint Commission, https://www.jointcommission.org/facts_about_federal_deemed_status_and_state_recognition/ (last visited June 18, 2018).

U.S. ex rel. Stambush SAC

was being manipulated and was reported as being approximately three times below the fair value market rate of $46.00 per hour; yet, because of the manipulation of expenses, which were not included as income, the actual rate being paid was $53.55.

47.     In 2015, Mr. Stambush learned during the regular course of business that a prospective employee, who was employed by Career Staff Unlimited, Inc., a subsidiary of Genesis HealthCare, Inc. (NYSE: GEN), was also being compensated with below market hourly rates, which were supplemented by non-taxable expenses. For example, for pay period 03/09/2015 to 03/15/15, the Pay Rate is allegedly $43.00 per hour; however, under HOURS AND EARNINGS, the Regular Rate is expressly stated on two lines as $17.65 and $17.64, which is far below the fair market value of $46.00. In essence, the wage was being manipulated and was reported as being approximately two and a half times below the fair value market rate of $46.00 per hour; yet, because of the manipulation of Non-Taxable Allowances, which were not included as income, the actual rate being paid was $43.00.

48.     On July 13, 2015, Mr. Stambush communicated with a new hire, who had worked for competitor Staffing Agencies. The new hire stated that "All the agencies I spoke to based the weekly pay rate on a 40 hour worked (*sic*) week. The un-taxed income included housing, meals and incidental. The agencies stated the lowest they could pay for the hourly rate was minimum wage ($11-16) in order to avoid raising IRS red flags. If the facilities census dropped, then the pay rate would decrease as well. Advanced medical, Core Medical, National Staffing, Therapist [U]nlimited … etc Almost all the staffing agencies except Stambush, so far operate this way. Which is why you hear a lot of new grads and experienced PTs going into travel. They, the agency agents, harp on about how you, the therapist, make the most money from the un-taxed

income. Which is why they will do their best to give the therapist the most the IRS will allow for un-taxed income and the taxed income will be less."

49.    The manipulation of rates, which related to price fixing, as well as the use of no-poaching agreements, formed the basis of the information that was used in Medicare Cost Report submissions, ACO certifications, payment for the treatment of Medicare beneficiaries, and the FSS 621 I procurement process.

## The Fraudulent Medicare Cost Report Submissions and ACO Certifications

50.    Medicare Cost Reports are complex and must be transmitted to the Centers for Medicare and Medicaid Services ("CMS"), in accordance with the Provider Reimbursement Manual ("PRM").  "Medicare acute care hospitals must report wage data, including wages, associated hours, and fringe benefits, annually to the Centers for Medicare & Medicaid Services (CMS). CMS uses this wage data to calculate acute care hospital wage indexes, which measure geographic area labor market costs relative to a national average. Federal law requires adjustment of Medicare hospital payments by wage indexes."[13]

51.    Hospitals that inaccurately report and certify wage data and other information on the Medicare Cost Report are subject to liability for violating the False Claims Act.

52.    From at least 2005, Memorial Hermann and the HCA hospitals that contracted with HealthTrust f/n/a Parallon and other Staffing Agencies for staffing services, certified on their respective annual CMS Form 2552 submissions that the report wage data, including wages, associated hours, and fringe benefits were truthful and compliant.

---

[13] United States Department of Health and Human Services – Office of the Inspector General, *Danbury Hospital Reported Overstated Wage Data Resulting in Medicare Overpayments* (Jan. 2016). The OIG found that Danbury Hospital failed to comply with Medicare requirements by overstating wage data in its FY 2010 Medicare cost report.

U.S. ex rel. Stambush SAC

53.     To the contrary, Memorial Hermann and the HCA hospitals falsely certified that various portions of Worksheet S-3 were accurate and in compliance with relevant laws.

**Worksheet S-3, Part II, Contract Labor:** The instructions reiterate that only contract labor costs reported on the hospital trial balance on Worksheet A, Column 2 are included with the wage index. In addition, the instructions were modified to add that contract labor not reported in the proper cost center will be disallowed from the wage index calculation. This change could affect the reporting of Administrative & General (A&G) under contract. Such costs should be properly grouped on Worksheet A or reclassified on Worksheet A-6 to include the costs on Line 28, A&G under contract.

Furthermore, the changes indicate that 'attestations or declarations from the vendor of hospitals are not acceptable in lieu of supporting documentation for wage, hours, wage-related costs and nonlabor costs.' Hospitals that have historically obtained an attestation from a vendor need to work with that vendor to obtain acceptable documentation, including, but not limited to, providing the hours on the invoice.[14]

**Worksheet S-3, Part II, Hours:** When employees or contracts are on-call, the hours aren't reported if the person is off site. If the provider is only being paid to be on-call and doesn't work a regular schedule, the contract information wouldn't be reported as noted above. Furthermore, the instructions clarify that if the employee or contractor is actually called into work, the dollars and hours would be reported.[15]

53.     The manipulation of rates, *supra*, related to price fixing, as well as the use of no-poaching agreements formed the basis of the information that was used in Medicare Cost Report submissions, ACO certifications, payment for the treatment of Medicare beneficiaries, and the FSS 621 I procurement process. On a March 20, 2015 regularly kept business document, CareerStaff Unlimited, Inc. indicated that the Pay Rate was $43.00 per hour; however, in reality the same regularly kept business document shows the actual rate paid as $11.42 and $11.43. This knowing falsehood caused the wage representations on the Medicare Cost Report to be fraudulent.

## The VA and the FSS 621 I Procurement Process

---

[14] *Id.*
[15] *Id.*

U.S. ex rel. Stambush SAC

54.    The aging population has led to greater numbers of individuals accessing the health care system. In order to meet this increased demand, many providers turn to healthcare staffing agencies to fulfill their needs – the VA is no exception.[16]

55.    "The VA is the nation's largest provider of graduate medical education and a major contributor to medical and scientific research." According to Dr. Harlan Krumholz in 2014 *Forbes* article, "the VA healthcare system has consistently out-performed the non-VA/private sector in quality of care and patient safety[; and]… it has been a model for accountability through its early adoption of electronic records."[17] It is certainly reasonable for the VA healthcare system to hold its contractors to the highest standards because of our country's commitment to and personal debts to our veterans.

56.    Executive Order 5398, signed by President Herbert Hoover on July 21, 1930, created the Veterans Administration.[18] In 1930, 54 hospitals, 4.7 million living veterans, and

---

[16]    Laura Dyrda, *7 Trends in Healthcare Staffing* (Mar. 30, 2017), https://www.beckersasc.com/asc-turnarounds-ideas-to-improve-performance/7-trends-in-healthcare-staffing.html.

[17] Harlan Krumholz, *3 Things To Know Before You Judge the VA Health System* (May 23, 2014), https://www.forbes.com/sites/harlankrumholz/2014/05/23/3-things-to-know-before-you-rush-to-judgment-about-va-health-system/#4236a68a55e4. Dr. Krumholz is the Harold H. Hines, Jr., Professor of Medicine and Professor in the Institute for Social and Policy Studies of Investigative, Medicine and of Public Health (Health Policy) at Yale University School of Medicine and the Director, Center for Outcomes Research and Evaluation, Yale-New Haven Hospital and Co-Director, Robert Wood Johnson Foundation Clinical Scholars Program, Yale University. Dr. Krumholz oversees one of the nation's first and most productive research units dedicated producing innovations to improve patient outcomes and promote better population health.

[18] Exec. Order No. 5398 (Jul. 21, 1930), http://www.presidency.ucsb.edu/ ws/?pid=75311.

31,600 employees fell under the umbrella of the Veterans Administration. Today, over 1,245 health care facilities, approximately 22 million veterans and more than 306,000 employees fall under the umbrella of the VA. The VA's projected budget for FY2018 is $1.87 billion.[19]

57.    The General Services Administration ("GSA") assumed oversight for government contracting in the 1940s.   Through a delegation of authority from the GSA the Veterans Administration established its own contract awards (or "schedules") program for services and products -   its Federal Supply Schedules (FSS), comprised of nine Schedules.[20] Federal Acquisition Regulation compliance is express within FSS and is required.

58.    In 2001, the Veterans Administration issued its first solicitation under its FSS 621 I - Professional and Allied Healthcare Staffing Services.[21] Since its inception, the 621 I program has grown substantially, awarding over $2 Billion in FSS sales between 2001 to 2008.[22] FSS 621 I sales have continued to be substantial with sales of $484,700,376 in FY 2012, $428,133,317 in FY 2013, $433,437,285 in FY 2014 and $437,262,304.94 in FY 2015.[23]

---

[19] U.S. Department of Veterans Affairs, *About VA*, https://www.va.gov/health/aboutvha.asp (last visited June 16, 2018).

[20] Barry L. McVay, *Getting Started In Federal Contracting, A Guide Through the Federal Procurement Maze*, Sixth Ed. (2017) at 224; *see also*, The Coalition for Government Procurement, *VA Multiple Award Schedule White Paper: Improvements Needed to Enhance the Effectiveness & Efficiency of the Program* (May 2016) at 4 (the "White Paper").

[21] Department of Veterans Affairs, Office of Inspector General,  "The Review of Federal Supply Schedule 621 I – Professional and Allied Healthcare Staffing Services" (VA Office of Inspector General, Washington, DC 20420, Report No. 08-02969-165 dated June 7, 2010)  at p. i (2010 OIG Report); *see also*, https://www.va.gov/oal/business/fss/schedule621I.asp.

[22] 2010 OIG Report at p. i.

[23] The White Paper at p. 57.

U.S. ex rel. Stambush SAC

59.     Table A charts the fraudulent FSS 621 I rates offered by several Defendant Staffing Agencies in their FSS 621 I filings compared to the Firms' fixed pricing.

**Table A.**

| Entity Name | FSS 621 I - VA Pricing (per diem staffer per hour) (NOTE: does not include travel or lodging).[24] | Memorial Hermann and/or HCA Parallon Fixed Pricing (per hour) | Timeframe |
|---|---|---|---|
| All Source Recruiting Group, Inc. d/b/a ARDOR Health Solutions | $65.00-$69.00 (Physical Therapist) | $61.00 (2015-2016; Memorial Hermann) | 2015-2016 |
| Management Health Systems, Inc. d/b/a Medpro Staffing and Direct Placement | $57.70 (Registered Nurse Med-Surg/General) | $54.00 (2015-Memorial Hermann); $52.00 (2015 – Parallon) | 07/15/05 to 07/14/15 |
| AMN Healthcare | $68.50 (Registered Nurse Med-Surg/General) | $54.00 (2015-Memorial Hermann); $52.00 (2015 – Parallon) | 09/26/13 to 09/25/18 |
| SHC Service, Inc. d/b/a Supplemental Health Care | $62.37 (Registered Nurse Med-Surg/General) | $54.00 (2015-Memorial Hermann); $52.00 (2015 – Parallon) | 06/01/13 to 05/31/18 |
| CareerStaff Unlimited, Inc.; and Therapists Unlimited, Inc. d/b/a Universal Physical Therapy[25] | $56.56 (Registered Nurse Med-Surg/General – CareerStaff); $65.00 (Physical Therapist – | $54.00 (2015-Memorial Hermann); $52.00 (2015 – Parallon) for Registered Nurse | 04/01/11 to 03/31/16 |

[24] The FSS 621 I Schedule specifically states that the rates do not include any food or travel stipends. Yet, as the evidence provided herein establishes, the rates that were submitted to the VA (and to CMS) by the Defendants did include travel and lodging stipends as part of the hourly rate.

[25] Both CareerStaff Unlimited, Inc. and Therapists Unlimited, Inc. d/b/a Universal Physical Therapy are subsidiaries of Genesis Healthcare, Inc. (NYSE: GEN), which is a publically traded holding                     company.                     http://www.genesishcc.com/investor-relations; http://www.careerstaff.com/our-brands.html;    and    http://www.therapistsunlimited.com    (last visited June 16, 2018).

U.S. ex rel. Stambush SAC                                                                                      23

| | Universal Physical Therapy). | Med-Surg/General; and $61.00 (2015-2016 Memorial Hermann) for a Physical Therapist. | |
|---|---|---|---|

60.     These submissions were both material and false. In sum, the Defendant Staffing Agencies knowingly submitted prices to the U.S. Government that were based upon antitrust and False Claims Act violations.

### V. LEGAL ANALYSIS
**False Claims Act Analysis**

61. Enacted by Congress as a way to uncover corrupt suppliers of goods to the Union Army, the False Claims Act (FCA), 31 U.S.C. 3729-3733 stems back to 1863.[26] As the FCA's legislative history illustrates, "[c]laims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program."[27] There are three broad categories of claims: (1) factually false; (2) legally false; and (3) reverse false claim. *Kane v. Healthfirst, Inc., 2015 WL 4619698 (S.D.N.Y. Aug. 3, 2015)*. A factually false claim is defined as an "incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001). By way of contrast, legally false claims are "predicated on an express or implied false certification of compliance with a regulation, statute or contract term—is more complicated, and has resulted in one of the most controversial debates on the proper scope of FCA liability."[28] Express false claim cases have been accepted by District Courts without controversy.

---

[26] The False Claims Act, 12 Stat. 696 (Mar. 2, 1863).

[27] S. REP. No. 345, 99th Cong., 2d Sess. 9 (1986), *reprinted in* 1986, U.S.C.A.A.N. 5266, 5274.

[28] John T. Boese, *Use of the False Claims Act to Enforce Federal Regulations: Necessary Limits on False Certification Cases Brought Under the civil False Claims Act*, American Bar

62.     *In Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989 (2016) (herein after "*Escobar*"), the United States Supreme Court resolved a split in the Circuit Courts as to whether or not an implied false certification claim was permissible. The Court held that the "implied" certification theory constitutes a viable basis for a cause of action under the False Claims Act. The caveat - "that any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation."

63.     In *Escobar*, Universal Health Services (e.g., the contractor), provided mental health services, and submitted claims for payment by Medicare and Medicaid. A Massachusetts teenager and Medicaid beneficiary, Yarushka Rivera received mental health counseling services from one of Universal Health Services' facilities. After receiving medication that a "doctor" Universal Health Services allowed to practice as such without the required training and credentials, Ms. Rivera died. Subsequently, her parents discovered that very few of the employees were actually licensed to provide mental health counseling or legally authorized to prescribe medication without supervision. Ultimately, the Court determined that knowingly being out of compliance with state regulatory requirements governing licensure and prescribing is material and a basis for liability under the FCA.

64.     Hospitals that inaccurately report and certify wage data and other information on the Medicare Cost Report are subject to liability for violating the False Claims Act. In *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1046 (1998), a hospital

---

Association Section of Litigation Conference (Jan. 29-31, 2016), http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/2015-joint cle/written_materials/02_what_you_don't_know_could_hurt_you_an_examination.authcheckda m.pdf (last visited June 16, 2018).

U.S. ex rel. Stambush SAC

executive "false[ly] certif[ied] that the Medicare services identified in the annual hospital cost reports complied with the laws and regulations dealing with the provision of healthcare services." The court found that the not only were there express statements in both the relevant statutes the HCFA form 2552 (now CMS Form 2552), but "Plaintiffs have provided evidence in the declaration of David Goldberg that HCFA relied on the certifications in determining the issues of payment and retention of payment as well as continued eligibility for participation in the Medicare program. The declaration also makes clear the nexus between the certifications and the injury to the government." *Id.* at 1046. "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995); cited by *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989, 1999 (2016)). In *U.S. ex rel. Thompson*, like here, the court found that falsely certifying that the items contained in the annual cost reports complied with laws and regulations dealing with the rendering of healthcare services was material.

65.     Violations of antitrust law can form the basis of a False Claims Act case. *United States of America, ex rel. Anthony B. Gale, Relator v. Gunnison Energy Corporation, SG Interests VII, LTD*, Complaint, Case No. 1:09-cv-02471-RBJ-KLM (D. Colo. 2009) (forming the basis of the False Claims Act case was the Defendants known collusion and false certifications in the BLM's bidding process in violation of 18 U.S.C. §1860 and 31 U.S.C. §3729(a)(1)(G)). In the present case, false claims were allegedly submitted in violation of both the FAR government procurement requirements during the FSS 621 I procurement process, the Medicare ACO Attestation, and the Medicare Cost Report submissions because of the underlying, material antitrust violations.

## VI. CAUSES OF ACTION

66.     The spirit of the FCA is to protect both the government and the taxpayers from contractors who scheme to profit from the U.S. Government by engaging in anti-competitive behaviors that violate antitrust laws, and by submitting false claims for payment. Defendants defied public policy by defrauding the VA and CMS.

### COUNT I
### (False Claims Act, 31 U.S.C. § 3729(a)(1))

67.     Plaintiff Scott Stambush repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

68.     As a prerequisite to bidding for healthcare staffing services to the VA, Defendants signed a certification that the submission was truthful and in compliance with the FAR as referenced in the GSA's FSS 621 I Schedule, contrary to FAR - CFR Title 48 (2013) and 48 CFR §3.303.

69.     As a prerequisite to participating the Medicare Shared Savings Program Accountable Care Organization, Memorial Hermann signed a certification, contrary to 42 C.F.R. § 425.208.

70.     As a prerequisite to participating in the Medicare Program, Memorial Hermann and HCA's hospitals attested to annual Medicare Cost Reports, contrary to 42 CFR § 413.24 and Section 1886(d)(3)(E) of the Social Security Act.

71.     As requirement for receiving payment for services under the Medicare Program, Defendants submitted and attested to the statements, contrary to the terms on CMS Form 1500.

72.     Defendants material false bids, certifications, attestations and submissions violated and continues to violate 31 U.S.C. §§ 3729, *et seq.*

### COUNT II

**(Sherman Act, 15 U.S.C. § 1)**

73.     Plaintiff Scott Stambush repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

74.     Defendants engaged in practices in flow of interstate commerce, which had anti-competitive effects when they submitted the initial bid submission and the subsequent invoices, Medicare Cost Reports, Medicare claims for payment, the ACO Agreement and other related forms to the U.S. Government through either the United States mail and/or electronic submission via the internet, resulted in false claims being submitted to the government in violation of antitrust laws.

75.     As a result of Defendants' anti-competitive conduct, the United States has suffered and continues to suffer by receiving bids and claims that are premised on price-fixing (pricing manipulation), no-poaching agreements and collusion among industry participants in violation of the Sherman Act, 15 U.S.C. § 1.

76.     Defendants material false bids, certifications, attestations and submissions violated and continues to violate Sherman Act, 15 U.S.C. § 1.

## VII. DAMAGES

77.     Plaintiff Scott Stambush repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

78.     The False Claims Act imposes liability on any person who "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim; conspires to commit a violation of the False Claims Act… or knowingly makes, uses, or

causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a). Prior to 2016, the last increases to the penalties for False Claims Act violations occurred on August 30, 1999 and changed the minimum from $5,000.00 to $5,500.00 and the maximum from $10,000.00 to $11,000.00, plus treble damages. 64 Fed. Reg. 47099, 47104 (Aug. 30, 1999). On August 1, 2016, the U.S. Department of Justice published Interim Final Rules, which significantly increased penalties under the False Claims Act for the first time in nearly eighteen years. Now, for violations occurring after November 2, 2015, the new minimum and maximum penalties are $10,781.00 to $21,563.00 plus treble damages. 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016).

79.     The Defendants allegedly submitted false bids, certifications, attestations and claims to the government beginning in 2005. These submissions continue today.

## VIII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment as follows:

A.     That Defendants be ordered to cease and desist from violating 31 U.S.C. §3729 *et seq.*; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812;

B.     That this Court enter judgment against Defendants in an amount equal to treble (three times) the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of 31 U.S.C. §3729 prior to November 2, 2015;

U.S. ex rel. Stambush SAC

C.    That this Court enter judgment against Defendants in an amount equal to treble (three times) the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $10,781.00 and not more than $21,563.00 for each violation of 31 U.S.C. §3729 after November 2, 2015, pursuant to 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016);

D.    That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

E.    The Relator and the U.S. Government recover the maximum amount under the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a;

F.    The Relator and the U.S. Government recover the maximum amount under the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812;

G.    That Relator and the U.S. Government be awarded all costs of this action, including attorneys' fees and expenses; and

H.    For such other and further relief as this Court may deem proper.

## VIII. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all claims and issues so triable.

Dated: June 19, 2018.

Respectfully Submitted,

RACHEL V. ROSE – ATTORNEY AT LAW, PLLC

By:_____
Rachel V. Rose, Esq.

//s// *Rachel V. Rose*
Rachel V. Rose
USDCDC No. TX0132
TX License 24074982
Rachel V. Rose - Attorney at Law, PLLC
Of Counsel - Reich and Binstock, LLP
PO Box 22718
Houston, TX 77227
Telephone: (713) 907-7442
Facsimile:   (713) 623-8724
rvrose@rvrose.com

//s// *Patricia D. Ryan*
Patricia D. Ryan
DC Bar No. 296053
Attorney at Law
6106 Harvard Avenue,
PO Box 633
Glen Echo, MD 20812
Telephone: (240) 481-6284
patriciaryan@pdrlaw.com

//s// *Dennis C. Reich*
Dennis C. Reich
USDCDC No. TX0150
TX License 16739600
Reich and Binstock LLP
4265 San Felipe Street
Suite 1000
Houston, Texas 77027
Telephone: (713) 622-7271
dreich@reichandbinstock.com

//s// *Kyle C. Reeb*
Kyle C. Reeb
Texas License 642686
Porter Hedges LLP
1000 Main Street
36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
kreeb@porterhedges.com
*Pro Hac Vice*

**Attorneys for Relator**

U.S. ex rel. Stambush SAC

UNITED STATES *ex rel.* SCOTT  STAMBUSH
United States District Court
District of Columbia
1:16-cv-01728 (APM)
SAC

# EXHIBIT A

CMS Form 460

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0373

# MEDICARE PARTICIPATING PHYSICIAN OR SUPPLIER AGREEMENT

| Name(s) and Address of Participant* | National Provider Identifier (NPI)* |
|---|---|
| | |

*List all names and the NPI under which the participant files claims with the Medicare Administrative Contractor (MAC)/carrier with whom this agreement is being filed.

The above named person or organization, called "the participant," hereby enters into an agreement with the Medicare program to accept assignment of the Medicare Part B payment for all services for which the participant is eligible to accept assignment under the Medicare law and regulations and which are furnished while this agreement is in effect.

1. **Meaning of Assignment:** For purposes of this agreement, accepting assignment of the Medicare Part B payment means requesting direct Part B payment from the Medicare program. Under an assignment, the approved charge, determined by the MAC/carrier, shall be the full charge for the service covered under Part B. The participant shall not collect from the beneficiary or other person or organization for covered services more than the applicable deductible and coinsurance.

2. **Effective Date:** If the participant files the agreement with any MAC/carrier during the enrollment period, the agreement becomes effective _____.

3. **Term and Termination of Agreement:** This agreement shall continue in effect through December 31 following the date the agreement becomes effective and shall be renewed automatically for each 12-month period January 1 through December 31 thereafter unless one of the following occurs:

    a. During the enrollment period provided near the end of any calendar year, the participant notifies in writing every MAC/carrier with whom the participant has filed the agreement or a copy of the agreement that the participant wishes to terminate the agreement at the end of the current term. In the event such notification is mailed or delivered during the enrollment period provided near the end of any calendar year, the agreement shall end on December 31 of that year.

    b. The Centers for Medicare & Medicaid Services may find, after notice to and opportunity for a hearing for the participant, that the participant has substantially failed to comply with the agreement. In the event such a finding is made, the Centers for Medicare & Medicaid Services will notify the participant in writing that the agreement will be terminated at a time designated in the notice. Civil and criminal penalties may also be imposed for violation of the agreement.

| Signature of participant (or authorized representative of participating organization) | Date |
|---|---|
| Title (if signer is authorized representative of organization) | Office Phone Number (including area code) |

| Received by (name of carrier) | Initials of Carrier Official | Effective Date |
|---|---|---|
| | | |

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0373. The time required to complete this information collection is estimated to average 15 minutes per response, including the time to review instructions, search existing data resources, gather the data needed and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Baltimore, Maryland 21244-1850.

Form CMS-460 (04/10)

**A0001**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

## INSTRUCTIONS FOR THE MEDICARE PARTICIPATING PHYSICIAN AND SUPPLIER AGREEMENT (CMS-460)

To sign a participation agreement is to agree to accept assignment for all covered services that you provide to Medicare patients.

### WHY PARTICIPATE?

If you bill for physicians' professional services, services and supplies provided incident to physicians' professional services, outpatient physical and occupational therapy services, diagnostic tests, or radiology services, your Medicare fee schedule amounts are 5 percent higher if you participate. Also, providers receive direct and timely reimbursement from Medicare.

Regardless of the Medicare Part B services for which you are billing, participants have "one stop" billing for beneficiaries who have Medigap coverage not connected with their employment and who assign both their Medicare and Medigap payments to participants. After we have made payment, Medicare will send the claim on to the Medigap insurer for payment of all coinsurance and deductible amounts due under the Medigap policy. The Medigap insurer must pay the participant directly.

Currently, the large majority of physicians, practitioners and suppliers are billing under Medicare participation agreements.

### WHEN THE DECISION TO PARTICIPATE CAN BE MADE:

- Toward the end of each calendar year, all MAC/carriers have an open enrollment period. The open enrollment period generally is from mid-November through December 31. During this period, providers who are currently enrolled in the Medicare Program can change their current participation status beginning the next calendar year on January 1. This is the only time these providers are given the opportunity to change their participation status. These providers should contact their MAC/carrier to learn where to send the agreement, and get the exact dates for the open enrollment period when the agreement will be accepted.

- New physicians, practitioners, and suppliers can sign the participation agreement and become a Medicare participant at the time of their enrollment into the Medicare Program. The participation agreement will become effective on the date of filing; i.e., the date the participant mails (post-mark date) the agreement to the carrier or delivers it to the carrier.

Contact your MAC/carrier to get the exact dates the participation agreement will be accepted, and to learn where to send the agreement.

### WHAT TO DO DURING OPEN ENROLLMENT:

If you choose to be a participant:

- Do nothing if you are currently participating, or

- If you are not currently a Medicare participant, complete the blank agreement (CMS-460) and mail it (or a copy) to each carrier to which you submit Part B claims. (On the form show the name(s) and identification number(s) under which you bill.)

If you decide not to participate:

- Do nothing if you are currently not participating, or

- If you are currently a participant, write to each carrier to which you submit claims, advising of your termination effective the first day of the next calendar year. This written notice must be postmarked prior to the end of the current calendar year.

**WHAT TO DO IF YOU'RE A NEW PHYSICIAN, PRACTITIONER OR SUPPLIER:**

If you choose to be a participant:

- Complete the blank agreement (CMS-460) and submit it with your Medicare enrollment application to your MAC/carrier.

- If you have already enrolled in the Medicare program, you have 90 days from when you are enrolled to decide if you want to participate. If you decide to participate within this 90-day timeframe, complete the CMS-460 and send to your MAC/carrier.

If you decide not to participate:

- Do nothing. All new physicians, practitioners, and suppliers that are newly enrolled are automatically non-participating. You are not considered to be participating unless you submit the CMS-460 form to your MAC/carrier.

We hope you will decide to be a Medicare participant.

Please call the MAC/carrier in your jurisdiction if you have any questions or need further information on participation.

**DO NOT SEND YOUR CMS-460 FORM TO CMS, SEND TO YOUR MAC/CARRIER. IF YOU SEND YOUR FORMS TO CMS, IT WILL DELAY PROCESSING OF YOUR CMS-460 FORMS.**

To view updates and the latest information about Medicare, or to obtain telephone numbers of the various Medicare Administrative Contractor (MAC)/carrier contacts including the MAC/carrier medical directors, please visit the CMS web site at *http://www.cms.gov/*.

UNITED STATES *ex rel.* SCOTT  STAMBUSH
United States District Court
District of Columbia
1:16-cv-01728 (APM)
SAC

# EXHIBIT B

Medicare Shared Savings Program Accountable Care Organization Participation Agreement

UNITED STATES *ex rel.* SCOTT  STAMBUSH

## MEDICARE SHARED SAVINGS PROGRAM ACCOUNTABLE CARE ORGANIZATION PARTICIPATION AGREEMENT

(Agreement with Accountable Care Organization Pursuant to Section 1899 of the Social Security Act and Title 42 Code of Federal Regulations (CFR) Part 425)

### AGREEMENT
between

THE CENTERS FOR MEDICARE & MEDICAID SERVICES
and

_____

doing business as (D/B/A) _____

In order to participate in the Shared Savings Program and receive payment under title XVIII of the Social Security Act as an Accountable Care Organization (ACO), _____ D/B/A _____operating under [Enter Shared Savings Track] agrees to comply with the provisions of section 1899 of the Social Security Act, Title 42 CFR Part 425, and all other applicable provisions of law and regulation.

This agreement, upon submission by the ACO of acceptable assurance of compliance with title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973 as amended, the Age Discrimination Act of 1975, and Title IX of the Education Amendments of 1972, and upon approval by the Centers for Medicare & Medicaid Services, shall be binding on the ACO.

TERM OF AGREEMENT: Pursuant to 42 CFR 425.200(b), the start date for the Agreement is [Agreement Start Date]____, with a term of three years, ending on [Agreement End Date]____ unless sooner terminated in accordance with applicable regulations.

PERFORMANCE YEAR: Pursuant to 42 CFR 425.200(c), the first Performance Year under this Agreement begins on [Agreement Start Date]____, and ends on [Agreement End Date]____. Subsequent Performance Years for the duration of this Agreement shall each be of 12 months duration, beginning on [Agreement Start Date]____.

APPLICABLE LAWS:

Statutory and Regulatory Changes During Term of Agreement: Pursuant to 42 CFR 425.212(a)(1), the ACO is subject to all statutory changes that become effective during the term of this Agreement. Pursuant to 42 CFR 425.212(a)(2), the ACO is subject to all regulatory changes that become effective during the term of this Agreement with the exception of the following program areas:

    (1) Eligibility requirements concerning the structure and governance of ACOs.
    (2) Calculation of sharing rate.
    (3) Beneficiary assignment.

B0001

Compliance With Laws: Pursuant to 42 CFR 425.208(b), the ACO agrees, and must require its ACO participants and ACO providers/suppliers, as defined under 42 CFR 425.20, and other individuals or entities performing functions or services related to the ACO's activities to agree to comply with all applicable laws including, but not limited to the following:

    (1) Federal criminal law.
    (2) The False Claims Act (31 U.S.C. 3729 *et seq.*).
    (3) The anti-kickback statute (42 U.S.C. 1320a-7b(b)).
    (4) The civil monetary penalties law (42 U.SC. 1320a-7a)
    (5) The physician self-referral law (42 U.S.C. 1395nn).

CERTIFICATIONS: Pursuant to 42 CFR 425.208(c), the ACO agrees, as a condition of participating in the program and receiving any shared savings payment, that an individual with the authority to legally bind the ACO will certify the accuracy, completeness, and truthfulness of any data or information requested by or submitted to the Centers for Medicare & Medicaid Services (CMS), including, but not limited to this Agreement, the application form and any quality data or other information on which CMS bases its calculation of shared savings payments and shared losses. All such certifications must meet the requirements set forth in 42 CFR 425.302. In addition, pursuant to 42 CFR 425.204(a), the ACO certifies that the ACO, its ACO participants, and its ACO providers/suppliers have agreed to become accountable for the quality, cost, and overall care of the Medicare fee-for-service beneficiaries assigned to the ACO.

Pursuant to 42 CFR 425.210(a), the ACO must provide a copy of this Agreement to all of its ACO participants, ACO provider/suppliers, and other individuals and entities involved in ACO governance.

The individual executing this Agreement on behalf of the ACO has authority to legally bind the ACO and hereby certifies the accuracy, completeness, and truthfulness of the statements contained in this Agreement and the Medicare Shared Savings Program Application, including any supplemental submissions to that application.

ACCEPTED FOR THE ACCOUNTABLE CARE ORGANIZATION BY:

Name _____ Title _____

Signature_____ Date _____

ACCEPTED BY THE CENTERS FOR MEDICARE & MEDICAID SERVICES BY:

Name_____ Title_____

Signature_____ Date _____

B0002

United States District Court
District of Columbia
1:16-cv-01728 (APM)
SAC

# EXHIBIT C

CMS Form 1500

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

**CARRIER**

[ ] PICA                                                                                      PICA [ ]

1. MEDICARE  MEDICAID  TRICARE  CHAMPVA  GROUP HEALTH PLAN  FECA BLK LUNG  OTHER
(Medicare#) (Medicaid#) (ID#/DoD#) (Member ID#) (ID#) (ID#) (ID#)
1a. INSURED'S I.D. NUMBER     (For Program in Item 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
3. PATIENT'S BIRTH DATE  SEX
MM DD YY   M  F
4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)
6. PATIENT RELATIONSHIP TO INSURED
Self Spouse Child Other
7. INSURED'S ADDRESS (No., Street)

CITY  STATE
8. RESERVED FOR NUCC USE
CITY  STATE

ZIP CODE  TELEPHONE (Include Area Code)
( )
ZIP CODE  TELEPHONE (Include Area Code)
( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)
10. IS PATIENT'S CONDITION RELATED TO:
11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER
a. EMPLOYMENT? (Current or Previous) YES NO
a. INSURED'S DATE OF BIRTH  SEX
MM DD YY   M  F

b. RESERVED FOR NUCC USE
b. AUTO ACCIDENT? YES NO  PLACE (State)
b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE
c. OTHER ACCIDENT? YES NO
c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME
10d. CLAIM CODES (Designated by NUCC)
d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES NO  If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED

**PATIENT AND INSURED INFORMATION**

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)
MM DD YY  QUAL.
15. OTHER DATE  QUAL.  MM DD YY
16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
MM DD YY  FROM  TO  MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
17a.
17b. NPI
18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
MM DD YY  FROM  TO  MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)
20. OUTSIDE LAB?  $ CHARGES
YES NO

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind.
A. B. C. D.
E. F. G. H.
I. J. K. L.
22. RESUBMISSION CODE  ORIGINAL REF. NO.
23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM | DD | YY | To MM | DD | YY | | | | | | | | | |
| 1 | | | | | | | | | | | | | NPI | |
| 2 | | | | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | NPI | |

**PHYSICIAN OR SUPPLIER INFORMATION**

25. FEDERAL TAX I.D. NUMBER  SSN EIN
26. PATIENT'S ACCOUNT NO.
27. ACCEPT ASSIGNMENT? (For govt. claims, see back) YES NO
28. TOTAL CHARGE $
29. AMOUNT PAID $
30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
SIGNED  DATE
32. SERVICE FACILITY LOCATION INFORMATION
a. b.
33. BILLING PROVIDER INFO & PH # ( )
a. b.

NUCC Instruction Manual available at: www.nucc.org  **PLEASE PRINT OR TYPE**  APPROVED OMB-0938-1197 FORM 1500 (02-12)

C0001

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law), 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section.For services to be considered "incident to" a physician's professional service's, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, "Carrier Medicare Claims Record," published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

☐ PICA

**1. MEDICARE** (Medicare#)  **MEDICAID** (Medicaid#)  **TRICARE** (ID#/DoD#)  **CHAMPVA** (Member ID#)  **GROUP HEALTH PLAN** (ID#)  **FECA BLK LUNG** (ID#)  **OTHER** (ID#)

**1a. INSURED'S I.D. NUMBER** (For Program in Item 1)

**2. PATIENT'S NAME** (Last Name, First Name, Middle Initial)

**3. PATIENT'S BIRTH DATE** MM DD YY  **SEX** M ☐ F ☐

**4. INSURED'S NAME** (Last Name, First Name, Middle Initial)

**5. PATIENT'S ADDRESS** (No., Street)

**6. PATIENT RELATIONSHIP TO INSURED** Self ☐ Spouse ☐ Child ☐ Other ☐

**7. INSURED'S ADDRESS** (No., Street)

**CITY** **STATE**

**8. RESERVED FOR NUCC USE**

**CITY** **STATE**

**ZIP CODE** **TELEPHONE** (Include Area Code) ( )

**ZIP CODE** **TELEPHONE** (Include Area Code) ( )

**9. OTHER INSURED'S NAME** (Last Name, First Name, Middle Initial)

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT?** (Current or Previous) YES ☐ NO ☐

**a. INSURED'S DATE OF BIRTH** MM DD YY  **SEX** M ☐ F ☐

**b. RESERVED FOR NUCC USE**

**b. AUTO ACCIDENT?** YES ☐ NO ☐ PLACE (State)

**b. OTHER CLAIM ID** (Designated by NUCC)

**c. RESERVED FOR NUCC USE**

**c. OTHER ACCIDENT?** YES ☐ NO ☐

**c. INSURANCE PLAN NAME OR PROGRAM NAME**

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. CLAIM CODES** (Designated by NUCC)

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?** YES ☐ NO ☐ If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED _____ DATE _____

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED _____

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)** MM DD YY QUAL.

**15. OTHER DATE** MM DD YY QUAL.

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION** FROM MM DD YY TO MM DD YY

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**  17a.  17b. NPI

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES** FROM MM DD YY TO MM DD YY

**19. ADDITIONAL CLAIM INFORMATION** (Designated by NUCC)

**20. OUTSIDE LAB?** YES ☐ NO ☐ $ CHARGES

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)  ICD Ind.

A. ___  B. ___  C. ___  D. ___
E. ___  F. ___  G. ___  H. ___
I. ___  J. ___  K. ___  L. ___

**22. RESUBMISSION CODE** ORIGINAL REF. NO.

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A. DATE(S) OF SERVICE From To | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM | DD | YY | MM | DD | YY | | | | | | | | | |
| 1 | | | | | | | | | | | | | NPI | |
| 2 | | | | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER** SSN ☐ EIN ☐

**26. PATIENT'S ACCOUNT NO.**

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back) YES ☐ NO ☐

**28. TOTAL CHARGE** $

**29. AMOUNT PAID** $

**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED _____ DATE _____

**32. SERVICE FACILITY LOCATION INFORMATION**

a. ___  b. ___

**33. BILLING PROVIDER INFO & PH #** ( )

a. ___  b. ___

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

CARRIER

PATIENT AND INSURED INFORMATION

PHYSICIAN OR SUPPLIER INFORMATION

C0003

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

[ ] PICA

**CARRIER**

1. MEDICARE [X] (Medicare#)   MEDICAID [X] (Medicaid#)   TRICARE [ ] (ID#/DoD#)   CHAMPVA [X] (Member/ID#)   GROUP HEALTH PLAN [X] (ID#)   FECA BLK LUNG [X] (ID#)   OTHER [X]   1a. INSURED'S I.D. NUMBER   XXXXXXXXXXXXXXXXXXX XXXXXXXX

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)   XXXXXXXXXXXXXXXXXXXXXXXXXXXX

3. PATIENT'S BIRTH DATE   MM XX DD XX YY XX   SEX M [X] F [X]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)   XXXXXXXXXXXXXXXXXX

5. PATIENT'S ADDRESS (No., Street)   XXXXXXXXXXXXXXXXXXXXXXXXXXXX

6. PATIENT RELATIONSHIP TO INSURED   Self [X] Spouse [X] Child [X] Other [X]

7. INSURED'S ADDRESS (No., Street)   XXXXXXXXXXXXXXXXXXXXXXXX

CITY XXXXXXXXXXXXXXXXXXXXXXX  STATE XX

8. RESERVED FOR NUCC USE

CITY XXXXXXXXXXXXXXXXXX  STATE XX

ZIP CODE XXXXXXXXXX   TELEPHONE (Include Area Code) XXXXXXXXXXXXX

ZIP CODE XXXXXXXX   TELEPHONE (Include XXXXXXXXXXXX

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) XXXXXXXXXXXXXXXXXX

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER XXXXXXXXXXXXXXXXXX

a. OTHER INSURED'S POLICY OR GROUP NUMBER XXXXXXXXXXXXXXXXXX

a. EMPLOYMENT? (Current or Previous) YES [X] NO [X]

a. INSURED'S DATE OF BIRTH MM XX DD XX YY XX   SEX M [X] F [X]

b. RESERVED FOR NUCC USE XXXXXXXXXXXXXXXX

b. AUTO ACCIDENT? YES [X] NO [X] PLACE (State) XX

b. OTHER CLAIM ID (Designated by NUCC) XXXXXXXXXXXXXXXXXX

c. RESERVED FOR NUCC USE XXXXXXXXXXXXXXXX

c. OTHER ACCIDENT? YES [X] NO [X]

c. INSURANCE PLAN NAME OR PROGRAM NAME XXXXXXXXXXXXXXXX

d. INSURANCE PLAN NAME OR PROGRAM NAME XXXXXXXXXX XXXXXXXXX

10d. CLAIM CODES (Designated by NUCC) XXXXXXXX

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES [X] NO [X]   If yes, complete items 9, 9a and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED XXXXXXXXX DATE XXXXXXXXXXX

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED XXXXXXXXXXXX

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM XX DD XX YY XX QUAL XXX

15. OTHER DATE QUAL XXX MM XX DD XX YY XX

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM XX XX XXXX TO XX XX XXXX

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE XXX   17b. NPI XXXXXXXXXXXX

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM XX XX XXXX TO XX XX XXXX

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) XXXXXXXXXXXXXXXXXXX

20. OUTSIDE LAB? YES [X] NO [X]   $CHARGES XXXXXXXXXX

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind. X
A. XXXXXXX  B. XXXXXX  C. XXXXXXX  D. XXXXXXX
E. XXXXXXX  F. XXXXXX  G. XXXXXXX  H. XXXXXXX
I. XXXXXXX  J. XXXXXX  K. XXXXXXX  L. XXXXXXX

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

**PHYSICIAN OR SUPPLIER INFORMATION**

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | XX XX XX XX XX XX | XXXXX | XXXXX | XXXXX | XXXXX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 2 | XX XX XX XX XX XX | XXXXX | XXXXX | XXXXX | XXXXX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 3 | XX XX XX XX XX XX | XXXXX | XXXXX | XXXXX | XXXXX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 4 | XX XX XX XX XX XX | XXXXX | XXXXX | XXXXX | XXXXX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 5 | XX XX XX XX XX XX | XXXXX | XXXXX | XXXXX | XXXXX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 6 | XX XX XX XX XX XX | XXXXX | XXXXX | XXXXX | XXXXX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |

25. FEDERAL TAX I.D. NUMBER XXXXXXXXXXXX SSN [X] EIN [X]

26. PATIENT'S ACCOUNT NO. XXXXXXXXXXXX

27. ACCEPT ASSIGNMENT? YES [X] NO [X]

28. TOTAL CHARGE $XXXXXXXXX

29. AMOUNT PAID $XXXXXXXX

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
SIGNED XXXXXXXXX DATE XXXX

32. SERVICE FACILITY LOCATION INFORMATION XXXXXXX
XXXXXXXXXXXXXXXXX
a. XXXXXXXXXXXXXX b. XXXXXXXXXXX

33. BILLING PROVIDER INFO & PH # (XXX) XXXXXXXXXX
XXXXXXXXXXXXXXXXX
a. XXXXXXXXXXXXXX b. XXXXXXXXXXX

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

C0004

UNITED STATES *ex rel.* SCOTT  STAMBUSH
United States District Court
District of Columbia
1:16-cv-01728 (APM)
SAC

# EXHIBIT D

Hospital Form 2552-10 – the Medicare Cost Report

4012.    <u>Worksheet S-10 - Hospital Uncompensated and Indigent Care Data</u>--Section 112(b) of the Balanced Budget Refinement Act (BBRA) requires that short-term acute care hospitals (§1886(d) of the Act) submit cost reports containing data on the cost incurred by the hospital for providing inpatient and outpatient hospital services for which the hospital is not compensated. Charity care charge data, as referenced in section 4102 of American Recovery and Reinvestment Act of 2009, may be used to calculate the EHR technology incentive payments made to §1886(d) hospitals and CAHs. Section 1886(n)(6)(B) of the Act, as added by section 602 of Consolidated Appropriations Act, 2016 adds subsection (d) Puerto Rico hospitals as eligible hospitals under the EHR incentive program. In addition, section 1886(r)(2) of the Act, as added by section 3133 of the ACA, requires an additional payment for uncompensated care for 1886(d) DSH eligible hospitals. Charity care charge data, discounts given to uninsured patients that meet the hospital's financial assistance policy/uninsured discount policy (hereinafter referred to as "financial assistance policy" or FAP), non-Medicare bad debt, and non-reimbursed Medicare bad debt may be used in the calculation of the uncompensated care payment. Section 1886(d) hospitals and CAHs are required to complete this worksheet.

<u>Definitions:</u>

<u>Uncompensated care</u>--Consists of charity care, non-Medicare bad debt, and non-reimbursable Medicare bad debt. Uncompensated care does not include courtesy allowances, discounts given to patients that do not meet the hospital's charity care policy, or discounts given to uninsured patients that do not meet the hospital's FAP, or bad debt reimbursed by Medicare.

<u>Charity Care and Uninsured Discounts</u>-- Charity care and uninsured discounts result from a hospital's policy to provide all or a portion of services free of charge to patients who meet the hospital's charity care policy or FAP. Charity care and uninsured discounts can include full or partial discounts. If a patient is not eligible for discounts under the hospital's charity care policy or FAP, then any discounts or reductions given to the standard managed care rate must not be accounted for as charity care or an uninsured discount. Discounts given to patients for prompt payment must not be included as charity care. For Medicare purposes, charity care is not reimbursable and unpaid amounts associated with charity care are not considered as an allowable Medicare bad debt. A hospital cannot claim as charity care amounts of unpaid deductibles and co-insurance for which it has received reimbursement from Medicare (reimbursed Medicare bad debt). (Additional guidance provided in the instruction for line 20.)

<u>Non-Medicare bad debt</u>--Charges for health services for which a hospital determines the non-Medicare patient has a financial responsibility to pay, but the non-Medicare patient does not pay. These amounts are subject to the cost-to-charge ratio (CCR). (Additional guidance provided in the instructions for lines 28 and 29.)

<u>Medicare bad debt</u>--When furnishing services to a Medicare beneficiary, a provider incurs costs in furnishing such covered services. A Medicare beneficiary may be responsible for paying a share of those costs as part of their applicable deductible and/or coinsurance amounts. When a Medicare beneficiary, or other responsible party, fails to pay the deductible and/or coinsurance amounts, the provider has incurred costs of furnishing services that are unrecovered. If the unpaid deductible and coinsurance amounts meet the criteria of 42 CFR 413.89, then these amounts may be allowable as Medicare bad debt (see CMS Pub. 15-1, chapter 3). Amounts reimbursed as a Medicare bad debt cannot be claimed as charity care.

<u>Non-reimbursable Medicare bad debt</u>--The amount of allowable Medicare coinsurance and deductibles considered to be uncollectible but are **not** reimbursed by Medicare under the requirements of 42 CFR 413.89(h) and CMS Pub. 15-1, chapter 3. (Additional guidance provided in the instructions for lines 27 and 27.01.)

D0001

Net revenue--Actual payments received or expected to be received from a payer (including co-insurance payments from the patient) for services delivered during this cost reporting period. Net revenue will typically be charges (gross revenue) less contractual allowance. (Applies to lines 2, 9, and 13.)

Public Programs--Federal, State, and/or local government programs paying, in full or in part, for health care (e.g., Medicare, Medicaid, CHIP and/or other Federal, State, or locally operated programs).

Instructions:

Cost-to-charge ratio:

Line 1--Enter the CCR resulting from Worksheet C, Part I, line 202, column 3, divided by Worksheet C, Part I, line 202, column 8.

For all inclusive rate no-charge-structure providers, enter your ratio as calculated in accordance with CMS Pub. 15-1, chapter 22, §2208.

Medicaid

**NOTE:**   The amount on line 18 must not include the amounts on lines 2 and 5. That is, the amounts on lines 2 and 5 are mutually exclusive from the amount on line 18.

Line 2--Enter the inpatient and outpatient payments received or expected for title XIX covered services delivered during this cost reporting period. Include payments for an expansion Children's Health Insurance Program (CHIP) program, which covers recipients who would have been eligible for coverage under title XIX. Include payments for all covered services except physician or other professional services, and include payments received from Medicaid managed care programs. If not separately identifiable, disproportionate share (DSH) and supplemental payments are included in this line. For these payments, report the amount received or expected for the cost reporting period, net of associated provider taxes or assessments.

Line 3--Enter "Y" for yes if you received or expect to receive any DSH or supplemental payments from Medicaid relating to this cost reporting period. Otherwise enter "N" for no.

Line 4--If you answered yes to question 3, enter "Y" for yes if all of the DSH *and*/or supplemental payments you received from Medicaid are included in line 2. Otherwise enter "N" for no and complete line 5.

Line 5--If you answered no to question 4, enter the DSH *and*/or supplemental payments the hospital received or expects to receive from Medicaid relating to this cost reporting period that were not included in line 2, net of associated provider taxes or assessments.

Line 6--Enter all charges (gross revenue) for title XIX covered services delivered during this cost reporting period. These charges relate to the services for which payments were reported on line 2.

Line 7--Calculate the Medicaid cost by multiplying line 1 times line 6.

Line 8--Enter the difference between net revenue and costs for Medicaid by subtracting the sum of lines 2 and 5 from line 7. If line 7 is less than the sum of lines 2 and 5, then enter zero.

D0002

Children's Health Insurance Program:

Line 9--Enter all payments received or expected for services delivered during this cost reporting period that were covered by a stand-alone CHIP program. Stand-alone CHIP programs cover recipients who are not eligible for coverage under title XIX. Include payments for all covered services except physician or other professional services, and include any payments received from CHIP managed care programs.

Line 10--Enter all charges (gross revenue) for services delivered during this cost reporting period that were covered by a stand-alone CHIP program. These charges relate to the services for which payments were reported on line 9.

Line 11--Calculate the stand-alone CHIP cost by multiplying line 1 times line 10.

Line 12--Enter the difference between net revenue and costs for stand-alone CHIP by subtracting line 9 from line 11. If line 11 is less than line 9, then enter zero.

Other state or local indigent care program:

Line 13--Enter all payments received or expected for services delivered during this cost reporting period for patients covered by a state or local government indigent care program (other than Medicaid or CHIP), where such payments and associated charges are identified with specific patients and documented through the provider's patient accounting system. Include payments for all covered services except physician or other professional services, and include payments from managed care programs.

Line 14--Enter all charges (gross revenue) for services delivered during this cost reporting period for patients covered by a state or local government program, where such charges and associated payments are documented through the provider's patient accounting system. These charges should relate to the services for which payments were reported on line 13.

Line 15--Calculate the costs for patients covered by a state or local government program by multiplying line 1 times line 14.

Line 16--Calculate the difference between net revenue and costs for patients covered by a state or local government program by subtracting line 13 from line 15. If line 15 is less than line 13, then enter zero.

Grants, donations and total unreimbursed cost for Medicaid, CHIP, and state/local indigent care:

Line 17--Enter the value of all non-government grants, gifts and investment income received during this cost reporting period that were restricted to funding uncompensated or indigent care. Include interest or other income earned from any endowment fund for which the income is restricted to funding uncompensated or indigent care.

Line 18--Enter all grants, appropriations or transfers received or expected from government entities for this cost reporting period for purposes related to operation of the hospital, including funds for general operating support as well as for special purposes (including but not limited to funding uncompensated care). Include funds from the Federal Section 1011 program, if applicable, which helps hospitals finance emergency health services for undocumented aliens. While Federal Section 1011 funds were allotted for federal fiscal years 2005 through 2008, any unexpended funds will remain available after that time period until fully expended even after federal fiscal year 2008. If applicable, report amounts received from charity care pools net of related provider taxes or assessments. Do not include funds from government entities designated for non-operating purposes, such as research or capital projects.

D0003

Line 19--Calculate the total unreimbursed cost for Medicaid, CHIP, and state and local indigent care programs by entering the sum of lines 8, 12, and 16.

Uncompensated care:

For each line 20 through 23, enter in column 3, the sum of columns 1 and 2.

Line 20--

For cost reporting periods beginning prior to October 1, 2016, and for subsection (d) Puerto Rico hospitals under §1886(n)(6)(B) beginning on or after October 1, 2016:

Enter the total initial payment obligation, measured at full charges, for patients, including uninsured patients, who are given a full or partial discount based on the hospital's charity care policy or FAP for healthcare services delivered during this cost reporting period for the entire facility. Include charity care/FAP charges for all services except physician and other professional services. Do not include charges for patients given courtesy allowances.

Enter in column 1, the full charges for uninsured patients and patients with coverage from an entity that does not have a contractual relationship with the provider *who meet the hospital's charity care policy or FAP*. In addition, enter in column 1, charges for non-covered services provided to patients eligible for Medicaid or other indigent care programs if such inclusion is specified in the hospital's charity care policy or FAP and the patient meets the hospital's policy criteria. Enter in column 2, the deductible and coinsurance payments required by the payer for insured patients covered by a public program or private insurer with which the provider has a contractual relationship that were written off to charity care. In addition, enter in column 2, non-covered charges for days exceeding a length-of-stay limit for patients covered by Medicaid or other indigent care programs if such inclusion is specified in the hospital's charity care policy or FAP and the patient meets the hospital's policy criteria. Do not include in column 2 amounts of deductible and coinsurance claimed as Medicare bad debt. For columns 1 and 2, do not reduce charges by any payments made for the patient liability; instead report these amounts on line 22.

For cost reporting periods beginning on or after October 1, 2016:

Enter the actual charge amounts for the entire facility (except physician and other professional services) of uninsured patients who were given full or partial discounts that were: (1) determined in accordance with the hospital's charity care criteria/policy or FAP, and (2) written off during this cost reporting period, regardless of when the services were provided. Do not include charges for patients given courtesy discounts or charges for uninsured patients with or without full or partial discounts who do not meet the hospital's charity care criteria or FAP. Charges for non-covered services provided to patients eligible for Medicaid or other indigent care program (including charges for days exceeding a length of stay limit) can be included, if such inclusion is specified in the hospital's charity care policy and the patient meets the hospital's charity care criteria.

Enter in column 1, the total charges, or the portion of the total charges, written off to charity care, for uninsured patients, and patients with coverage from an entity that does not have a contractual relationship with the provider who meet the hospital's charity care policy or FAP. In addition, enter in column 1, charges for non-covered services provided to patients eligible for Medicaid or other indigent care programs, if such inclusion is specified in the hospital's charity care policy or FAP and the patient meets the hospital's policy criteria. The total charges or the portion of total charges is the amount the patient is not responsible for paying (e.g., 100% of charges if the patient qualified for 100% discount or 70% of charges if the patient qualified for a 70% partial discount).

D0004

Enter in column 2, the deductible and coinsurance payments required by the payer for insured patients covered by a public program or private insurer with which the provider has a contractual relationship that were written off to charity care.  In addition, enter in column 2, the non-covered charges for days exceeding a length-of-stay limit for patients covered by Medicaid or other indigent care programs if such inclusion is specified in the hospital's charity care policy or FAP and the patient meets the hospital's policy criteria.  Do not include in column 2 amounts of deductible and coinsurance claimed as Medicare bad debt.

Note:  When reporting charity care or uninsured discounts for cost reporting periods beginning on or after October 1, 2016, amounts a hospital received for charity care charges reported on line 20 of a prior cost reporting period and not reported on line 22 of a prior cost reporting period, must be offset on line 22 of the current cost report.  Lines 20 and 22 must be completed independently. Do not record on line 20 net charity care charges; line 20 must include all charges and line 22 must include all receipts.

Column 3:  Enter the sums of columns 1 and 2.

Line 21--Enter in column 1, the cost of uninsured patients approved for charity care and uninsured discounts by multiplying line 20, column 1, times the CCR on line 1.  Enter in column 2, the deductibles and coinsurance not subject to the CCR on line 1 for insured patients approved for charity care (line 20, column 2, minus line 25), plus the non-covered charges for insured patients for days exceeding a length-of-stay limit that are subject to the CCR on line 1 (line 25 multiplied by line 1).

Line 22--For cost reporting periods beginning prior to October 1, 2016, and for subsection (d) Puerto Rico hospitals under §1886(n)(6)(B) beginning on or after October 1, 2016, enter payments received or expected to be received from patients who have been approved for charity care or uninsured discounts for healthcare services delivered during this cost reporting period.  Include such payments for all services except physician or other professional services.  Payments from payers should not be included on this line.  Use column 1 for uninsured patients and patients with coverage from an entity that does not have a contractual relationship with the provider, and use column 2 for patients covered by a public program or private insurer with which the provider has a contractual relationship.

For cost reporting periods beginning on or after October 1, 2016, charity care charges or uninsured discounts reported on line 20 include amounts written off with no expectation of payment.  Enter all payments received during this cost reporting period, regardless of when the services were provided, from patients for amounts previously written off on line 20 as charity care or uninsured discounts.  Enter such payments for the entire facility, except physician or other professional services.  Use column 1 for payments received from uninsured patients and patients with coverage from an entity that does not have a contractual relationship with the provider, and use column 2 for payments received from patients covered by a public program or a private insurer with which the provider has a contractual relationship.  Do not include grants or other mechanisms of funding for charity care on line 22.  Payments entered on this line must not exceed charity care or uninsured discount amounts written off in the cost reporting period.  Do not include payments received that represent a patient's liability, or amounts that were not previously written off on line 20 as charity care or uninsured discounts.

Line 23--Calculate the cost of charity care by subtracting line 22 from line 21.  Use column 1 for uninsured patients and patients with coverage from an entity that does not have a contractual relationship with the provider, and use column 2 for patients covered by a public program or private insurer with which the provider has a contractual relationship.  For each column, if the amount on line 22 is greater than line 21, enter zero.

D0005

**Line 24**--Enter "Y" for yes if any charges for patient days beyond a length-of-stay limit imposed on patients covered by Medicaid or other indigent care program are included in the amount reported on line 20, column 2, and complete line 25. Otherwise enter "N" for no.

**Line 25**--If you answered yes to question 24, enter charges for patient days beyond a length-of-stay limit imposed on patients covered by Medicaid or other indigent care program for services delivered during this cost reporting period. The amount must match the amount of such charges included in line 20, column 2.

**Line 26**--Enter the total facility (entire hospital complex) amount of bad debts (Medicare bad debts and non-Medicare bad debts), net of recoveries, written off during this cost reporting period on balances owed by patients regardless of the date of service. Include such bad debts for all services except physician and other professional services. Amounts from line 20 above must not be included here. The amount reported must also include the amounts reported on Worksheets: E, Part A, line 64; E, Part B, line 34; E-2, line 17, columns 1 and 2; E-3, Part I, line 11; E-3, Part II, line 23; E-3, Part III, line 24; E-3, Part IV, line 14; E-3, Part V, line 25; E-3, Part VI, line 8; E-3, Part VII, line 34; I-5, line 5 (line 5.05, column 2 for cost reporting periods that overlap or begin on or after or January 1, 2011); J-3, line 21; M-3, line 23; and N-4, line 9. For privately insured patients, do not include bad debts that were the obligation of the insurer rather than the patient.

**Line 27**--Enter the total facility (entire hospital complex) Medicare reimbursable (also referred to adjusted) bad debts, pursuant to 42 CFR 413.89(h), as the sum of Worksheets: E, Part A, line 65; E, Part B, line 35; E-2, line 17, columns 1 and 2 (line 17.01, columns 1 and 2 for cost reporting periods that begin on or after October 1, 2012); E-3, Part I, line 12; E-3, Part II, line 24; E-3, Part III, line 25; E-3, Part IV, line 15; E-3, Part V, line 26; E-3, Part VI, line 10; I-5, line 11; J-3, line 21 (line 22 for cost reporting periods that begin on or after October 1, 2012); M-3, line 23 (line 23.01 for cost reporting periods that begin on or after October 1, 2012); and N-4, line 10.

**Line 27.01**--Enter the total facility (entire hospital complex) Medicare allowable bad debts as the sum of Worksheets: E, Part A, line 64; E, Part B, line 34; E-2, line 17, columns 1 and 2; E-3, Part I, line 11; E-3, Part II, lines 23; E-3, Part III, line 24; E-3, Part IV, line 14; E-3, Part V, line 25; E-3, Part VI, line 8; I-5, line 5.05, column 2; J-3, line 21; M-3, line 23; and N-4, line 9. The amount entered on this line must also be included in the amount on line 26.

**Line 28**--*Effective for cost reporting periods beginning before October 1, 2013, calculate the non-Medicare bad debt expense by subtracting line 27 from line 26. Effective for cost reporting periods beginning on or after October 1, 2013, calculate the non-Medicare bad debt expense by subtracting line 27.01 from line 26.*

**Line 29**--Calculate the cost of non-Medicare and non-reimbursable Medicare bad debt expense.

*For cost reporting periods beginning before October 1, 2013, t*he cost of non-Medicare *and non-reimbursable Medicare* bad debt expense is calculated by multiplying line 28 by the CCR on line 1.

*For cost reporting periods beginning on or after October 1, 2013, the cost of non-Medicare bad debt expense is calculated by multiplying line 28 by the CCR on line 1.* The cost of non-reimbursable Medicare bad debt expense is calculated by subtracting line 27 from line 27.01 (this amount is not multiplied by the CCR on line 1). Enter the sum of the non-Medicare bad debt expense and the non-reimbursable Medicare bad debt expense.

**Line 30**--Calculate the cost of uncompensated care by entering the sum of lines 23, column 3, and line 29.

**Line 31**--Calculate the cost of unreimbursed and uncompensated care and by entering the sum of lines 19 and 30.

D0006

4012 (Cont.)            FORM CMS-2552-10            03-18

*This page is reserved for future use.*

40-80.2            Rev. 14

D0007